Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| MIGDALIA HANCE GARCÍA "HOGAR MORIAH" Recurrente v. DEPARTAMENTO DE LA FAMILIA Recurrida | KLRA202400625 | REVISIÓN JUDICIAL procedente de la Junta Adjudicativa, Departamento de la Familia Caso núm.: 2021 PPSF 00030 Sobre: Protección a Adultos |
|---|---|---|

Panel integrado por su presidenta la juez Lebrón Nieves, la jueza Romero García y el juez Rivera Torres.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 14 de marzo de 2025.

Comparece ante este tribunal apelativo, la Sra. Migdalia Hance García (señora Hance García o la recurrente) mediante el *Recurso de Revisión* de epígrafe solicitándonos que revoquemos la *Resolución* emitida por la Junta Adjudicativa del Departamento de la Familia (la Junta o la recurrida) el 20 de septiembre de 2024, notificada ese mismo día. Mediante dicho dictamen, la Junta confirmó la determinación emitida por la Unidad de Maltrato Institucional (UMI) de que los referidos en su contra estaban fundamentados por negligencia en las áreas de supervisión y salud.

Por las razones que expondremos a continuación, confirmamos el dictamen recurrido.

### I.

El 26 de agosto de 2020, la UMI Adultos del Departamento de la Familia (el Departamento), Región de Humacao, recibió un referido al cual le fue asignado el número 10291029. En apretada síntesis, se alegó que la recurrente y su esposo, el Sr. Alejandro

Castillo Padró (el matrimonio Castillo-Hance), maltrataban a los adultos mayores que tenían a su cargo. Al día siguiente, en horas de la noche, el Sr. Omar Figuera Cay, en aquel entonces Trabajador Social del Departamento, junto a dos (2) policías, y varios trabajadores sociales arribaron al Hogar Moriah, el cual es administrado por el matrimonio Castillo-Hance en el Municipio de Juncos.[1]

Una vez investigadas las alegaciones, el 31 de agosto de 2020, la UMI preparó un *Informe* en el cual se concluyó que el referido 10291029 resultó con fundamentos, ya que se validó la negligencia en las áreas de supervisión y salud. En consecuencia, se recomendó la cancelación de la licencia al matrimonio Castillo-Hance como Hogar Certificado. Además, se recomendó que no volvieran a poseer ningún tipo de licencia o certificación para operar Hogares. No conforme, la señora Hance García presentó un recurso de *Apelación* ante la Junta Adjudicativa del Departamento.

El 26 de abril de 2024, se celebró la vista adjudicativa a la cual comparecieron la recurrente y, por el Departamento, la Sra. Lisa Rodríguez Méndez, Supervisora UMI Adultos, Región de Humacao, representadas por la Lcda. Melba Ramos Aponte y la Lcda. Ana Gueits Pérez, respectivamente.

La prueba testifical consistió en el testimonio de la señora Hance García[2] y el de la señora Rodríguez Méndez. Esta última fue cualificada como perito en trabajo social.[3] Como prueba documental de la parte recurrente se marcó la siguiente:

> Exhibit 1 - Copia del Certificado de Recertificación Núm. JU- 2023-013 otorgada a la señora Hance García para operar un hogar sustituto de personas de edad avanzada o adultos con impedimento y siendo válida hasta el 19 de abril de 2021 emitido por el Departamento de la Familia.

---

[1] El Hogar Moriah es un hogar sustituto para adultos mayores con impedimentos referidos por el Departamento.
[2] En la vista adjudicativa la licenciada Ramos Aponte manifestó que el testimonio del señor Castillo Padró constituía prueba acumulativa.
[3] Véase, TPO, a la pág. 98.

> Exhibit 2- Copia de Certificado de Registro del Hogar para Adultos con impedimentos Moriah, Inc. es una corporación doméstica sin fines de lucro con fecha del 21 de octubre de 2016, emitido por el Departamento de Estado.
>
> Exhibit 3 en bloque: **IIIA** Registro de Visitas del Hogar-Consta de ocho (8) páginas de las cuales la primera tiene fecha del 17 de diciembre de 2015 y la última del 16 de julio de 2017. **IIIB**-Consta de ocho (8) páginas. Contiene hojas de Registro de visitas Hogar Moriah donde la primera tiene fecha del 16 de agosto del 2017 y hojas del formulario DEFAM-540 Notificación de Hallazgos y Recomendaciones sobre el Establecimiento Visitado. **IIIC**- Consta de seis (6) páginas. Contiene hojas de Registro de visitas Hogar Moriah donde la primera tiene fecha del 28 de octubre de 2029 y copia del formulario ADFAN-PSA-15 Visita del Trabajador Social o Técnico de servicios a la Familia al Hogar o Establecimiento de Cuidado Sustituto. **IIID**-Consta de diez (10) páginas. Contiene hojas del formulario DEFAM-540-Notificacion de Hallazgos y Recomendaciones sobre el Establecimiento Visitado y hojas de Registros de visitas Hogar Moriah donde la primera tiene fecha del 18 de marzo del 2018.

A su vez, la prueba documental de la parte recurrida consistió en la siguiente:

> Exhibit 1 – Informe de intervención preparado y firmado por el Sr. Omar Figueroa Cay, Trabajador Social I, UMI, Región Humacao y firmado por la Sra. Liza Rodríguez Méndez, Supervisora de Trabajo Social I, UMI, Región Humacao.

El 21 de agosto de 2024, se emitió el *Informe de la Oficial Examinador* en el cual se consignaron treinta y cinco (35) determinaciones de hechos[4]; y a base de estos, se recomendó a la Junta: "**CONFIRMAR** la acción notificada de determinación de fundamento emitida por la UMI objeto de la Apelación [...]."[5] El 20 de septiembre siguiente, la Junta dictó la *Resolución* recurrida en la que se acogió el referido informe y confirmó la determinación apelada.[6] Inconforme, la señora Hance García solicitó la reconsideración del dictamen, la cual fue declarada *No Ha Lugar* el 11 de octubre de 2024.[7]

Todavía en desacuerdo, el 8 de noviembre de 2024, la recurrente acude ante esta *Curia* mediante el recurso de revisión de

---

[4] Véase, Apéndice del Recurso, a las págs. 28-49.
[5] *Íd.*, a la pág. 55. [Énfasis en el original]
[6] *Íd.*, a la págs. 23-26.
[7] *Íd.*, a la págs. 93-94.

epígrafe imputándole al foro recurrido haber incurrido en los siguientes errores:

> ERRÓ EL DEPARTAMENTO DE LA FAMILIA AL NO SEGUIR EL DEBIDO PROCESO DE LEY VIOLANDO LOS DERECHOS DE LOS RECURRENTES AL: DAR POR CIERTAS LAS ACUSACIONES FALSAS, HECHAS EN SU CONTRA POR PERSONAS CON INTENCIONES DE PERJUDICAR A LOS RECURRENTES, SIN OBTENER TODOS LOS TESTIMONIOS NECESARIOS DE LAS PERSONAS INDISPENSABLES, NI HABER TRAÍDO A LA VISTA PRUEBA DE PERITAJE QUE CERTIFICARA DE LA SUPUESTA MALA ALIMENTACIÓN QUE SE ALEGA: AL NO TOMAR EN CUENTA EL BIENESTAR DE LOS RESIDENTES AL REMOVERLOS DEL HOGAR MORIAH, Y UBICARLOS EN HOGARES DONDE NO LES DIERON EL MEJOR CUIDADO, LO QUE RESULTÓ EN AGRAVIO PARA ELLOS Y AL NO TOMAR EN CUENTA EL TESTIMONIO DE LOS PROPIOS RESIDENTES, QUIENES NEGARON HABER RECIBIDO MALTRATO DE PARTE DE LOS RECURRENTES, NI DE SUS FAMILIARES.
>
> ERRÓ EL DEPARTAMENTO DE LA FAMILIA AL NO SEGUIR EL DEBIDO PROCESO DE LEY AL REMOVER LOS RESIDENTES DEL HOGAR MORIAH, SIN NINGUNA ORDEN OFICIAL AL EFECTO PARA INSPECCIONAR EL HOGAR, EXPONIENDO A LOS RESIDENTES DE DICHO HOGAR Y AL NO REALIZAR UNA EVALUACIÓN COMPLETA Y PRECISA DE LA SITUACIÓN DE CADA RESIDENTE, LO QUE LLEVÓ A DECISIONES INCORRECTAS SOBRE LA NECESIDAD DE LA REMOCIÓN.
>
> ERRÓ EL DEPARTAMENTO DE LA FAMILIA AL RECOMENDAR EN SU INFORME SOBRE INVESTIGACIÓN, LA CANCELACIÓN DE LICENCIA DE LA SRA. MIGDALIA HANCE GARCÍA Y EL SR. ALEJANDRO CASTILLO COMO HOGAR CERTIFICADO Y RECOMENDAR NO VOLVER A POSEER NINGÚN TIPO DE LICENCIA O CERTIFICACIÓN PARA OPERAR HOGARES, NO DÁNDOLES LA OPORTUNIDAD DE ESTABLECER UN PLAN DE MEJORAMIENTO Y RECOMENDACIONES, EL CUAL EL HOGAR PUEDE APLICAR, PREJUICIÁNDOSE CONTRA ESTE.

Luego de varios trámites ante esta *Curia*, el 9 de enero de 2025, dictamos una *Resolución* tomamos por estipulada la transcripción de la prueba oral (TPO), y nos dimos por cumplidos en cuanto al *Alegato Suplementario …* que fue presentado por la recurrente. De igual manera, concedimos a la parte recurrida el término de treinta (30) días para su presentar su alegato.

El 19 de febrero de 2025, la parte recurrida presentó el alegato en oposición, por lo que nos damos por cumplidos y a su vez, decretamos perfeccionado el recurso.[8]

Analizados los escritos de las partes, la transcripción de la prueba oral y el expediente apelativo; así como estudiado el derecho aplicable, procedemos a resolver.

**II.**

**Revisión judicial de las decisiones administrativas**

La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que estas desempeñen sus funciones conforme a la ley. *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891-892 (2008). En el ámbito administrativo, los tribunales apelativos deben conceder una gran deferencia a las decisiones emitidas por las agencias debido a la vasta experiencia y conocimiento especializado en los asuntos que les han sido encomendados. *Asoc. Fcias. v. Caribe Specialty et al. II.*, 179 DPR 923, 940 (2010).[9]

No obstante, esta deferencia reconocida a las decisiones de las agencias administrativas habrá de ceder, solamente, <u>cuando la misma no esté basada en evidencia sustancial, cuando la agencia erró en la aplicación de la ley y cuando su actuación resulte ser una arbitraria, irrazonable o ilegal</u>. *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800, 822 (2012). Por consiguiente, la revisión judicial de una decisión administrativa se circunscribe a analizar: (1) si el remedio concedido fue razonable; (2) si las determinaciones están sostenidas con evidencia sustancial; y (3) si erró la agencia al aplicar la ley. *Asoc. Fcias. v. Caribe Specialty et al. II, supra*, a la pág. 940.

En este ejercicio, nuestro más alto foro ha sido enfático en que

---

[8] El 28 de febrero de 2025 la recurrente instó un escrito titulado *Réplica a "Alegato del Departamento de la Familia"*, lo cual nos es permitido por nuestro Reglamento, por lo que lo damos por no puesto.

[9] Véanse, también, *Martínez v. Rosado*, 165 DPR 582, 589, (2005); *Otero v. Toyota*, 163 DPR 716, 727 (2003).

las determinaciones de hechos de organismos y agencias públicas tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca suficiente evidencia para derrotarla. *Camacho Torres v. AAFET,* 168 DPR 66, 91 (2006). Quien las impugne tiene el deber insoslayable, para prevalecer, de presentar ante el foro judicial la evidencia necesaria que permita, como cuestión de derecho, descartar la presunción de corrección de la determinación administrativa. El peso de la prueba descansa entonces sobre la parte que impugna la determinación administrativa. *Íd.*

Como corolario a lo anterior, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAUG), Ley núm. 38-2017, 3 LPRA sec. 9675, dispone que las determinaciones de hechos realizadas, por una agencia administrativa, serán sostenidas por el tribunal revisor si se encuentran respaldadas por evidencia suficiente que surja del expediente administrativo al ser considerado en su totalidad. *Pacheco v. Estancias,* 160 DPR 409, 432 (2003). De modo, que la parte afectada deberá reducir el valor de la evidencia impugnada o demostrar la existencia de otra prueba que sostenga que la actuación del ente administrativo no estuvo basada en evidencia sustancial. *Otero v. Toyota,* 163 DPR 716, 728 (2003). En consecuencia, nuestra función se circunscribe a considerar si la determinación de la agencia es razonable, ya que se persigue evitar que el tribunal revisor sustituya el criterio de la agencia por el suyo. *Íd.*

Por otro lado, destacamos que para ejercer nuestra función revisora es necesario que la agencia emita una resolución fundamentada. El propósito de la Sección 3.14 de la LPAU (3 LPRA sec. 2164) de requerir determinaciones de hechos y conclusiones de derecho en una decisión administrativa es proporcionar a los

tribunales la oportunidad de revisar adecuadamente la decisión administrativa facilitando esa tarea; fomentar que la agencia adopte una decisión cuidadosa y razonada dentro de los parámetros de su autoridad y discreción; ayudar a la parte afectada a entender por qué el organismo administrativo decidió como lo hizo manteniéndola informada para poder decidir si acude al foro judicial o acata la determinación; y por último, evitar que los tribunales se apropien de funciones que corresponden propiamente a las agencias administrativas bajo el concepto de especialización y pericia. *Mun. San Juan v. Plaza Las Américas,* 169 DPR 310 (2006).

En cuanto a las conclusiones de derecho son revisables en toda su extensión. Sección 4.5, Ley núm. 38-2017, *supra.* Sin embargo, ello "no implica que los tribunales revisores tienen la libertad absoluta de descartar libremente las conclusiones e interpretaciones de la agencia." *Otero v. Toyota,* supra, a la pág. 729. Cuando un tribunal llega a un resultado distinto, este debe determinar si la divergencia es a consecuencia de un ejercicio razonable y fundamentado de la discreción administrativa, ya sea por la pericia, por consideraciones de política pública o en la apreciación de la prueba. *Íd.*

En conclusión, el tribunal solo podrá sustituir el criterio de la agencia por el propio cuando no pueda encontrar una base racional para explicar la determinación administrativa. *Hernández, Álvarez v. Centro Unido,* 168 DPR 592 (2006).

**Ley de Establecimientos para Personas de Edad Avanzada**

La Ley núm. 94 de 22 de junio de 1977, según enmendada, conocida como la Ley de Establecimientos para Personas de Edad Avanzada, 8 LPRA secs. 351-368 (Ley 94), le confiere al Departamento de la Familia la facultad exclusiva para emitir licencias a toda institución dedicada al cuidado de personas de edad

avanzada que se establezca en Puerto Rico.[10]

A su vez, la Ley 94 autoriza al Departamento a promulgar los reglamentos necesarios para asegurar la implantación del estatuto.[11] En virtud de esta facultad, dicha agencia adoptó el *Reglamento para el Licenciamiento y Supervisión de Establecimientos para el Cuidado de Personas de Edad Avanzada*, Reglamento Núm. 7349 de 4 de diciembre de 2006, según enmendado (Reglamento Núm. 7349). Dicho reglamento establece los requisitos necesarios para el licenciamiento y la supervisión de establecimientos dedicados al cuidado de personas de edad avanzada.[12]

La Sección 3.7 del Reglamento Núm. 7349 define el Hogar Sustituto como: un "hogar de una familia que se dedique al cuidado de no más de seis (6) personas de edad avanzada provenientes de otros hogares o familias, durante las veinticuatro (24) horas del día, con o sin fines pecuniarios. En los hogares donde el grupo familiar lo constituyan otras personas de edad avanzada, adultos incapacitados y menores de dieciocho (18) años, relacionados con o sin nexos de consanguinidad o afinidad que requieran atención, supervisión y cuidado del operador(a) se incluirá en la capacidad del hogar. La persona natural a quien se le otorgue la licencia para operar un hogar sustituto debe residir en el hogar sustituto licenciado."

En lo aquí pertinente, la Sección 3.21 del Reglamento Núm. 7349 define negligencia como el "acto de omisión, que puede ser intencional o no deliberado, de no proveer bienes o servicios necesarios." Se considera maltrato o negligencia:[13]

> a. Cuando el administrador(a), director(a), operador(a), encargado(a) o el personal de un establecimiento incurra o permitan que otro incurra, en acciones u omisiones no accidentales o que sea razonablemente previsible de que su resultado ocasione daño físico o

---

[10] Véase, Artículo 4 de la Ley 94, 8 LPRA sec. 354.
[11] *Íd.*, Artículo 10, 8 LPRA sec. 360.
[12] Véase, Sección 2.2 del Reglamento Núm. 7349.
[13] *Íd.*

mental, o que le **ponga en riesgo inminente de sufrir daños o peligro a la vida o daños a la salud física, mental, emocional o psicológica** de la persona de edad avanzada.

b. Las siguientes situaciones, entre otras, pueden considerarse como actos de negligencia en las personas de edad avanzada:

1) **No se le provee alimentos** o **líquidos de acuerdo a su condición, a tiempo** y en la cantidad suficiente para su bienestar.

2) **No se le brinda el tratamiento médico** o medicinas y los cuidados necesarios para prevenir, curar o aliviar cualquier daño físico de la persona de edad avanzada **con la premura necesaria para cada situación en particular**.

3) **Dejar solo/a a la persona de edad avanzada sin la debida supervisión** o vigilancia, o que el personal no le preste el cuidado y la atención requerida a su condición física o de salud.

4) …
5) …
6) …
7) …

Destacamos que, entre los deberes de un operador o encargado del hogar, se encuentra designar a una persona de veintiuno (21) años o más para sustituirle durante su ausencia. Este sustituto **reunirá las calificaciones y requisitos del puesto**.[14] Asimismo, debe cumplir con un registro de visitas y un expediente médico, entre otros registros.[15] Este último, debe contener notas del estado o progreso de salud.

Respecto a los alimentos, el hogar sustituto tiene que presentar un menú certificado por un(a) nutricionista-dietista. Además, debe estar basado en las **condiciones de salud que requieran ajustes nutricionales**. Incluso, los alimentos tienen que ser nutritivos, variados, balanceados y el servicio estará a cargo de personas de experiencia en la elaboración de alimentos.[16]

De otra parte, el Artículo XX del Reglamento Núm. 7349 dispone sobre el procedimiento para la denegación, suspensión y cancelación de licencia. Así, entre las razones para la cancelación se encuentra el incumplimiento con la Ley 94 y su reglamento.[17] A su

---

[14] *Íd.,* Sección 5.2
[15] *Íd.,* Sección 7.3 y Sección 8.1 inciso c.
[16] *Íd.,* Sección 9.2, incisos j y k.
[17] *Íd.,* Sección 20.1.

vez, puntualizamos que "[l]as querellas de maltrato o negligencia podrán ser investigadas por el personal de la Administración de Familias y Niños, entiéndase la Unidad de Maltrato Institucional a Adultos. Cuando la Unidad de Maltrato **corrobore el maltrato y recomiende** medidas correctivas o **cancelación**, denegación o suspensión de licencia, **la Oficina de Licenciamiento procederá a evaluar la recomendación de esa Unidad y tomará la acción según corresponde a Derecho**."[18] La Oficina de Licenciamiento del Departamento de la Familia hará la notificación de la cancelación de licencia <u>por correo, con acuse de recibo, a la dirección del establecimiento</u>, según consta en el expediente de la Oficina de Licenciamiento, o **personalmente por escrito** en el establecimiento, señalando la violación, según ley y reglamento.[19] La notificación informará sobre el recurso de apelación. Por lo tanto, todo poseedor de licencia tendrá derecho a apelar la decisión ante la Junta Adjudicativa.[20]

### III.

En el caso ante nuestra consideración, la recurrente alegó que erró la Junta al confirmar la determinación de la UMI. En apretada síntesis, argumentó que el Departamento actuó contrario al debido proceso de ley al no ser notificada en un tiempo razonable de los hallazgos y negarse a concederle una oportunidad para mejorar las áreas señaladas. En fin, entiende que la determinación de cancelación de la licencia es una penalización severa.

Apuntalamos que, al estar cobijadas las decisiones de las agencias administrativas por la mayor deferencia de los tribunales, nuestra intervención está limitada a establecer si las determinaciones de hechos son razonablemente sostenidas con la

---

[18] *Íd.*, Sección 21.1. [Énfasis nuestro]
[19] *Íd.,* Sección 21.3.
[20] *Íd.,* Sección 21.4.

prueba presentada. Por ello, del análisis del expediente ante nuestra consideración podemos concluir que, tanto la prueba testifical como la documental, presentada en la Vista Adjudicativa del 26 de abril de 2024, demostraron la existencia de indicadores de negligencia por parte de los operadores del Hogar Moriah.

Al respecto, destacamos que de dicha evidencia surge que el registro médico de los residentes no estaba al día y no se les ofrecía el debido seguimiento.[21] Lo que contradijo lo manifestado por la recurrente respecto a que el Dr. Miguel Laboy visitaba el hogar cada seis (6) meses.[22] Más aún, la señora Rodríguez Méndez manifestó que la visita al hogar fue en el 2020, pero los últimos documentos médicos y sociales que aparecían en los expedientes eran del 2017.[23]

Relacionado a lo anterior, la perito testificó que una de las residentes presentaba una úlcera sacral y la misma no se había referido para ser atendida. "Y que sólo se le estaba tratando con alcohol en el hogar."[24] Por lo que, la señora Rodríguez Méndez expresó que los adultos incapacitados fueron expuestos a peligro debido a que estos no estaban siendo cuidados por personas autorizadas por el Departamento, ni menos se les cubría todas las necesidades.[25]

Esta también declaró que los residentes validaron, cuando se entrevistaron, las alegaciones de maltrato.[26] Incluyendo a un participante que defecó y lo limpiaron ("restregaron") con una escoba y se le echó "Lestoil".

De igual manera, se corroboró que la señora Hance García confeccionaba el menú sin utilizar las guías de alimentos y que la

---

[21] Véase, TPO, a la pág. 105, líneas 10-19.

[22] En el *Informe sobre Investigación Hogar Moriah, Juncos* (*Informe*), en la entrevista con la recurrente, esta indicó que el Dr. Laboy acudía al hogar todos los meses, pero "no pudo proveer evidencia de los días que ha visitado a los pacientes." Véase, Apéndice del Recurso, a la pág. 68.

[23] Véase, TPO, a la pág. 105, líneas 15-17, y a la pág. 148, líneas 17-24.

[24] *Íd.,* a la pág. 106, líneas 1-4.

[25] *Íd.,* a las líneas 5-12.

[26] *Íd.,* a la pág. 118, líneas 10-23.

comida que se ofrecía en el almuerzo era la misma que, en muchas ocasiones, se recalentaba y se le daba en la tarde.[27] Incluso, "[n]o había ningún tipo de dieta para los adultos que tenían diabetes. Y que la mayor parte del tiempo estaban supervisados por personas que no estaban autorizadas."[28]

Sobre lo anterior, la recurrente, en la vista adjudicativa, había expresado que el esposo cocinaba "de todo" y que el menú que servían en el hogar iba de acuerdo a las condiciones de cada uno de los pacientes.[29] Tal aseveración fue refutada por el testimonio de la perito.

Recordemos que el Reglamento Núm. 7349 exige que el hogar sustituto tiene que presentar un menú certificado por un(a) nutricionista-dietista. Asimismo, este cuerpo de normas requiere que el menú debe estar basado en las **condiciones de salud que requieran ajustes nutricionales**. Incluso, los alimentos tienen que ser nutritivos, variados, balanceados y el servicio estará a cargo de personas de experiencia en la elaboración de alimentos.

De igual manera, la investigación arrojó que el hijo del matrimonio Castillo-Hance es quien se encargaba de los residentes cuando estos se ausentaban. Asimismo, la señora Hance García manifestó que su hijo bañaba a los varones por autorización de ella,[30] lo que este ya había aceptado en el *Informe*.[31] La recurrente no presentó prueba que demostrara que este posee las calificaciones y requisitos para ejercer tal labor, según dispuesto en el Reglamento Núm. 7349, antes citado. Agregamos que en el *Informe* se estableció que la señora Hance García aceptó que, tanto el pastor de la iglesia a la que asisten como su hijo, no estaban autorizados por el

---

[27] En el *Informe* se indicó que cuando los residentes estaban a cargo del hijo del matrimonio Castillo-Hance la comida que se les daba era "Chef Boyardee". Véase, Apéndice del Recurso, a la pág. 36. Véase, TPO, a la pág. 119, líneas 7-13
[28] Véase, TPO, a la pág. 119, líneas 12-14., y a la pág. 120, líneas 18-20.
[29] *Íd.*, a la pág. 74, líneas 14-25.
[30] *Íd.*, a la pág. 69, líneas 4-7, y a la pág. 72, líneas 16-20.
[31] Véase, Apéndice del Recurso, a la pág. 72.

Departamento a estar a cargo de los residentes ni tampoco lo había notificado a la agencia para que conozca de ello.[32]

En conclusión, la recurrente no logró demostrar la existencia de otra prueba que redujera o menoscabara el valor probatorio de la evidencia sustancial presentada, siendo la determinación de la agencia, a nuestro juicio, una razonable. Reiteramos que las determinaciones de hechos de la recurrida tienen a su favor una presunción de regularidad y corrección, la cual debió ser rebatida por la señora Hance García con evidencia suficiente para descartar la misma. Como hemos indicado, ello no sucedió. El peso de la prueba descansa sobre quien impugna la determinación y las meras alegaciones resultan insuficientes.

De otra parte, destacamos que el procedimiento llevado a cabo por el Departamento estuvo acorde al Reglamento Núm. 7349 y el Reglamento Núm. 7757 de 5 de octubre de 2009, el cual, entre otros asuntos, dispone el procedimiento de apelación ante la Junta. La Sección 21.3 del Reglamento Núm. 7349 establece que la Oficina de Licenciamiento del Departamento hará la notificación de la cancelación de licencia por correo, con acuse de recibo, a la dirección del establecimiento, e informará sobre el recurso de apelación.

En el presente caso, la notificación de la determinación sobre la cancelación de la licencia (cierre del hogar) se realizó personalmente y la recurrente presentó oportunamente su apelación ante la Junta, por lo que no encuentra apoyo el planteamiento sobre la violación de un debido proceso en el trámite administrativo. De igual manera, la Sección 21.1 claramente preceptúa, en el inciso (d), que las querellas de maltrato o negligencia serán investigadas por la UMI y una vez corroborado el

---

[32] Véase, Apéndice del Recurso, a la pág. 67.

maltrato o negligencia podrá recomendar medidas correctivas o la cancelación, denegación o suspensión de licencia. Entonces, la Oficina de Licenciamiento procederá a evaluar la recomendación de esa Unidad y tomará la acción según corresponde a derecho. Recordemos que en este caso se recomendó la cancelación de la licencia ante la seriedad de los hallazgos encontrados, los cuales están contenidos en el *Informe Sobre Investigación Hogar Moriah, Juncos* y sobre los que declaró ampliamente la perito en trabajo social, señora Rodríguez Méndez. Apuntalamos que esta explicó que dicho informe no se envía por correo y la parte conoce de los hallazgos una vez es citada.[33] La recurrente fue citada por teléfono, conoció los hallazgos, se discutieron y se le explicó el proceso de apelación el cual presentó.[34]

De otro lado, reiteramos que el Departamento es la única agencia autorizada para expedir licencia a todo establecimiento para cuidado de personas de edad avanzada. Por lo cual, posee la facultad para visitar e inspeccionar los establecimientos cuando lo entienda necesario, o por lo menos una vez cada tres (3) meses.[35] De igual forma, como bien reconoció la recurrente en la vista adjudicativa, el Departamento es quien decide en dónde ubica los participantes.[36]

En virtud de todo lo antedicho, resolvemos que los errores señalados no fueron cometidos. La determinación impugnada está sostenida en el expediente y representan el balance más racional y justiciero. La señora Hance García no presentó prueba que estableciera que la recurrida no tomó una decisión adecuada y razonable dentro de los parámetros de su autoridad y discreción.

---

[33] *Íd.*, a la pág. 133, líneas 2-5, a la pág. 139, líneas 22-24, a la pág. 140, y a la pág. 147, líneas 17-18.
[34] *Íd.*, a las págs. 140, líneas 19-25, y 141, 144-146.
[35] Véase, Artículo 5 de la Ley 94, 8 LPRA sec. 355.
[36] Véase, TPO, a la pág. 59, líneas 21-25, y a la pág. 60, línea 1.

**IV.**

Por los fundamentos anteriormente expuestos, se confirma *Resolución* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones